## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION,<br><br>   Plaintiff,<br><br>   v.<br><br>TREVOR G. COOK,<br>PATRICK J. KILEY,<br>UBS DIVERSIFIED GROWTH, LLC,<br>UNIVERSAL BROKERAGE FX<br>MANAGEMENT, LLC,<br>OXFORD GLOBAL ADVISORS, LLC,<br>and OXFORD GLOBAL PARTNERS, LLC,<br><br>   Defendants,<br><br>   and<br><br>BASEL GROUP, LLC,<br>CROWN FOREX, LLC,<br>MARKET SHOT, LLC,<br>PFG COIN AND BULLION,<br>OXFORD DEVELOPERS, S.A.<br>OXFORD FX GROWTH, L.P.,<br>OXFORD GLOBAL FX, LLC,<br>OXFORD GLOBAL MANAGED<br>FUTURES FUND, L.P., UBS DIVERSIFIED<br>FX ADVISORS, LLC, UBS DIVERSIFIED<br>FX GROWTH, L.P., UBS DIVERSIFIED<br>FX MANAGEMENT, LLC, CLIFFORD<br>BERG, and ELLEN BERG,<br><br>   Relief Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>: **CIVIL ACTION**<br>: **FILE NO.**  09-sc-3333<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

### FILED UNDER SEAL

### COMPLAINT

**SCANNED**

NOV 2 3 2009

FILED _11/23/2009_
RICHARD D. SLETTEN

JUDGMENT ENTD _____

DEPUTY CLERK _BS_

U.S. DISTRICT COURT MPLS

①

Plaintiff United States Securities and Exchange Commission

("Commission") alleges as follows:

## NATURE OF THE ACTION

1.      The Commission brings this emergency law enforcement action to

charge two leading figures behind a fraudulent scheme that has taken in at least

$190 million from at least 1,000 victims, and to freeze and recover millions of

dollars derived from the scheme before those assets disappear.

2.      The Defendants are two Minnesota residents, Trevor G. Cook

("Cook") and Patrick J. Kiley ("Kiley"), together with several shell companies

owned or controlled by either Cook or Kiley—UBS Diversified Growth, LLC,

Universal Brokerage FX Management, LLC, Oxford Global Advisors, LLC, and

Oxford Global Partners, LLC (collectively "the Defendant Shell Companies").

(None of the entities using the UBS name referred to in this Complaint is affiliated

with UBS, AG, the Switzerland-based global financial services firm.)

3.      From at least July 2006 through July 2009, Cook and Kiley,

directly and indirectly through the Defendant Shell Companies, raised at least

$190 million from at least 1,000 investors by selling investments in a purported

foreign currency trading venture.

4.      Cook and Kiley represented that they would deposit each

investor's funds into a segregated account in the investor's name; that they would

2

use each investor's funds to trade foreign currencies; and that the foreign currency trading would generate annual returns of 10% to 12%.

5.　　　Cook and Kiley also represented that their foreign currency trading venture involved little or no risk and that the investors' principal would be safe and could be withdrawn at any time.

6.　　　Cook and Kiley's representations were false.

7.　　　Cook and Kiley did not place each investor's money in a segregated account in the name of the investor.

8.　　　Instead, Cook and Kiley pooled the investors' funds in bank and trading accounts in the names of entities that they controlled, including the Defendant Shell Companies and Relief Defendants Basel Group, LLC, Crown Forex, LLC, Market Shot, LLC, PFG Coin and Bullion, Oxford FX Growth, L.P., Oxford Global FX, LLC, Oxford Global Managed Futures Fund, L.P, UBS Diversified FX Advisors, LLC, UBS Diversified FX Growth, L.P., and UBS Diversified FX Management, LLC (collectively "the Relief Defendant Shell Companies").

9.　　　Cook also gave investor funds to his wife's parents, Relief Defendants Clifford and Ellen Berg, in order to conceal the location of those assets.

10.　　　Cook and Kiley, in effect operating a Ponzi scheme, diverted approximately $51 million of the investors' funds to pay ostensible returns and principal to other investors.

3

11.     Cook and Kiley misappropriated $42.8 million of the investors' funds, including $18 million that Cook diverted to buy ownership interests in two trading firms; $12.8 million that Cook and Kiley transferred to bank accounts in Panama, purportedly to finance the construction of a casino; and at least $12 million that Cook and Kiley used to pay their personal expenses, including $4.8 million that Cook lost through gambling, $2.8 million that Cook used to acquire the Minneapolis building popularly known as the Van Dusen Mansion; $2.7 million withdrawn in cash and cashier's checks, $1.3 million used to pay legal fees, $1 million transferred to a private investment fund, and $1 million used to pay personal credit cards and bank payments.

12.     Cook and Kiley converted another $108 million of the investors' money to fund banking and trading accounts that they held in names of their various shell companies, including certain of the Defendant Shell Companies and the Relief Defendant Shell Companies.

13.     Cook and Kiley used some of the money in their shell companies' accounts to trade foreign currencies. However, their trading involved significant risks and lost at least $48 million.

14.     Throughout their fraud, Cook and Kiley provided their victims with phony account statements that falsely reported substantial, continuing gains from foreign currency trading in segregated investor accounts.

15.     At the present, Cook and Kiley's victims face losses of at least $139 million.

16.     As a result of the foregoing, Cook, Kiley, UBS Diversified Growth, LLC, Universal Brokerage FX Management, LLC, Oxford Global Advisors, LLC, and Oxford Global Partners, LLC, directly and indirectly, have engaged in and, unless enjoined, will continue to engage in acts, practices, transactions, and courses of business that violate Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

17.     The Commission brings this lawsuit to hold the Defendants accountable for their flagrant and repeated violations of the federal securities laws; to freeze and preserve the assets of Cook, Kiley, the Defendant Shell Companies, the Relief Defendant Shell Companies, and the Relief Defendants Clifford and Ellen Berg; and to prevent further harm to investors.

## JURISDICTION AND VENUE

18.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§78u(d) and 78u(e)].

19.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

20.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

21.     Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the District of Minnesota and elsewhere.

22.     Cook, Kiley, the Defendant Shell Companies, and the Relief Defendant Shell Companies, directly and indirectly, made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein.

23.     Cook, Kiley, and the Defendant Shell Companies will, unless enjoined, continue to engage in the acts, practices and courses of business set forth in this complaint, and acts, practices and courses of business of similar purport and object.

## DEFENDANTS

24.     **Trevor G. Cook** is a 37-year-old resident of Burnsville, Minnesota.  Cook is not registered with the Commission in any capacity and has never been associated with an entity registered with the Commission.  Cook was previously an associated person with various commodities and futures trading firms.

25.     **Patrick J. Kiley** is a 71-year-old resident of Minneapolis, Minnesota.  He is the founder of UBS Diversified Growth, LLC and Universal Brokerage FX Management, LLC.  For the past several years, ending in or about July 2009, Kiley hosted a financial themed radio show on which he marketed the foreign currency investments that he and Cook offered and sold.  Kiley is not

registered with the Commission in any capacity and has never been associated with a registered entity.

26.     **UBS Diversified Growth, LLC** is a Minnesota limited liability corporation with its principal place of business in Burnsville, Minnesota. Kiley is the registered agent of UBS Diversified Growth, LLC. UBS Diversified Growth, LLC is not registered with the Commission in any capacity. No registration statement has been filed with the Commission with respect to securities issued by UBS Diversified Growth, LLC.

27.     **Universal Brokerage FX Management, LLC** is a Minnesota limited liability corporation with its principal place of business in Burnsville, Minnesota. Kiley is the registered agent of Universal Brokerage FX Management, LLC. The registered address of Universal Brokerage FX Management, LLC is the same as that of UBS Diversified Growth, LLC. Universal Brokerage FX Management, LLC is not registered with the Commission in any capacity. No registration statement has been filed with the Commission with respect to securities issued by Universal Brokerage FX Management, LLC.

28.     **Oxford Global Advisors, LLC** is a Minnesota limited liability company with its principal place of business in Minneapolis, Minnesota. Oxford Global Advisors, LLC is not registered with the Commission in any capacity. No registration statement has been filed with the Commission with respect to securities issued by Oxford Global Advisors, LLC. In or around July 2008,

Oxford Global Advisors, LLC ceased doing business under this name and was later reformed as Oxford Global Partners, LLC.

29.     **Oxford Global Partners, LLC**, formed in November 2008, is a Minnesota limited liability company with its principal place of business in Minneapolis, Minnesota.  Cook is part-owner of Oxford Global Partners, LLC. Oxford Global Partners, LLC is not registered with the Commission in any capacity.  No registration statement has been filed with the Commission with respect to securities issued by Oxford Global Partners, LLC.

## RELIEF DEFENDANTS

30.     **Market Shot, LLC, Oxford FX Growth, L.P., Oxford Global Managed Futures Fund, L.P., Oxford Global FX, LLC, PFG Coin and Bullion, UBS Diversified FX Advisors, LLC, UBS Diversified FX Growth, L.P., and UBS Diversified FX Management, LLC** are all Minnesota limited liability companies or limited partnerships.  **UBS Diversified FX Advisors, LLC, UBS Diversified FX, Growth L.P., and UBS Diversified FX Management, LLC** are no longer active companies.

31.     **Basel Group, LLC and Crown Forex, LLC** are shell companies created by Cook and Kiley that have not been formally organized under the laws of any state.

32.     **Clifford and Ellen Berg** are Cook's wife's parents and reside in Apple Valley, Minnesota. The Bergs invested a total of $293,769 into the foreign currency program since 2007.  They received $948,848 back, including $829,469

which Cook gave them in June and July 2009 to deposit in their bank accounts in order to conceal investor assets.

## OVERVIEW OF THE FRAUD

33.     From in or about July 2006 through July 2009, Cook and Kiley raised at least $190 million through the fraudulent offer and sale of investments in a foreign currency trading venture.

34.     Cook and Kiley's victims number at least 1,000 and reside in numerous states throughout the United States.  Many of the victims are senior citizens who are unsophisticated and inexperienced in financial matters.  Some victims liquidated their retirement accounts to invest in Cook and Kiley's venture.

35.     From at least July 2006 until approximately late 2007, Cook and Kiley both sold investments in a foreign currency trading venture offered through Defendant UBS Diversified Growth, LLC ("UBS Diversified").   From early 2008 until July 2009, Kiley sold the investments primarily through his entity Universal Brokerage FX Management, LLC, which he often referred to as Universal Brokerage FX ("Universal Brokerage"), and Cook sold the investments primarily through Oxford Global Advisors, LLC ("Oxford Global Advisors") and Oxford Global Partners, LC ("Oxford Global Partners").

36.     These offerings were part of a single scheme to defraud perpetrated by Cook and Kiley.

37.     On several occasions, Cook and Kiley met with prospective investors together, and they often handed out business cards representing that they

9

worked out of the same office.

38.    Certain of their offering documents were identical, except for the name of the company offering the investments.

39.    Cook and Kiley made the same representations about the features of the investments to investors.

40.    Cook and Kiley consistently represented that they would use the investors' funds to engage in foreign currency trading which would generate annual returns of 10% or more for the investors.

41.    Cook and Kiley represented to investors that their, i.e., Cook and Kiley's, compensation would consist of fees based on the investors' principal and profits.

42.    Cook and Kiley represented to investors that Cook was in charge of the trading.

43.    The investors were called on to do nothing except invest their money.

44.    The investors' fortunes were dependent on the Defendants' efforts in the foreign currency trading venture.

45.    Both the Defendants' and the investors' profits were linked, because both the investors' returns and the Defendants' income hinged upon the success of the Defendants' foreign currency trading venture.

46.    Cook and Kiley represented that the investors' principal would be exposed to little or no risk.

10

47.    Cook and Kiley represented that the investors could withdraw their money at any time.

48.    Cook and Kiley represented to investors that their money would be placed in a segregated account in each investor's name.

49.    Cook and Kiley's representations were false.

50.    Cook and Kiley skimmed millions of dollars from their victims' investments and used those funds to pay their personal expenses, to invest in offshore trading firms, to finance the construction of a casino in Panama, and for other illegal purposes.

51.    Cook and Kiley did not open separate, segregated accounts for the investors, but instead pooled the investors' money in common accounts at several banks and trading firms.

52.    To the extent that Cook and Kiley used investor money to trade foreign currencies at all, they employed high risk trading strategies that resulted in millions of dollars of losses.

53.    Cook and Kiley used investor money, in effect operating a Ponzi scheme, to pay purported returns and profits and principal to other investors who sought to withdraw money from the venture.

### THE UNIVERSAL OFFERINGS

54.    From at least July 2006 through in or about July 2009, Kiley offered and sold investments in the foreign currency trading venture primarily through two companies that he established, UBS Diversified and Universal

11

Brokerage (the "Universal Offerings").

55.     Kiley solicited investors through a radio program called "Follow the Money," which was broadcast in several cities until July 2009.

56.     Kiley also solicited investors through his website and Universal Brokerage's website and through word of mouth.

57.     Kiley also met and solicited prospective investors in person.

58.     From at least July 2006 through in or about July 2009, Cook worked with Kiley to solicit investors for the Universal offerings.

59.     Kiley and Cook met with prospective investors together.

60.     Cook passed out business cards stating that he was the Managing Partner of UBS entities.

61.     Kiley told some investors that the trading was conducted through a complex computer program purchased and overseen by Cook.  Kiley's representation was false.

62.     On the Universal Brokerage website Kiley claimed that the firm was a "leader in international foreign exchange markets."  Kiley's representation was false.

63.     In letters accompanying the Universal Offering materials, Kiley represented that UBS Diversified and Universal Brokerage each was a "registered financial advisory firm."  Kiley's representation was false.

64.     Kiley represented to investors that that he would invest their money in a foreign currency trading venture.  Kiley's representation was false.

12

65.     Kiley represented to investors that the venture employed a trading strategy that he had been conducting for many years for institutions but that was now available for the first time for individual investors. Kiley's representation was false.

66.     Kiley represented to investors that the program employed an arbitrage strategy and took advantage of differences in the interest rates of different foreign currencies. Kiley represented that the strategy involved trading the currencies of the G-5 countries. Kiley's representations were false.

67.     Kiley represented to investors that the trading strategy involved investing in a long position in one currency and an offsetting short position in a second currency. Kiley represented that because the currency positions offset, there was no market exposure and therefore no risk to the investor's principal. Kiley's representations were false.

68.     In certain offering documents, Kiley called this strategy a "fully hedged carry trade." He represented that the strategy realized a profit because the account containing the long position collected more interest than the interest paid by the account containing the short position. Kiley's representations were false.

69.     Kiley also represented to certain investors that the strategy utilized a bank that complied with Shariah law, which forbids the payment of interest, and that because no interest was paid to establish the short position, a greater profit could be earned. Kiley's representations were false.

70.     Kiley represented that his strategy would realize a profit regardless

13

of what happened to the currency market and that his program had earned significant returns. Kiley's representations were false.

71.     In one offering document, Kiley claimed to have earned past returns as high as 46% annually. In another document, he represented that the program was currently earning 12% per year. Kiley told many investors that they would earn double-digit annual returns. Kiley's representations were false.

72.     Kiley also represented that investors would not lose their principal investment. One of the offering documents represented that investors' principal was "fully protected" and another represented that the investor's capital investment would be "protected." Kiley's representations were false.

73.     In multiple offering documents, Kiley represented that the trading strategy eliminated all currency fluctuation risk and market exposure. Kiley's representation was false.

74.     One of Kiley's offering documents represented that "100% of the time the long USD/JPY position is fully insured" and that "qualified funds are insured by" a bond held at Deutsche Bank. Kiley's representations were false.

75.     Kiley also told investors that their funds were completely liquid and could be withdrawn at any time. Kiley's representation was false.

76.     Kiley told investors that their funds would be kept in segregated accounts and not commingled with other investors' or corporate funds. One offering document represented that investor "funds are deposited with a commercial bank in the client's name." Kiley's representation was false.

77.     Some of Kiley's offering documents represented that investors would be assessed a "setup fee", a "management fee" equal to 2% of the assets invested, and a "performance fee" equal to 20% to 50% of the profits generated on the investment.  Other Kiley offering documents represented that investors would not be charged a setup fee, but would be charged a deferred sales charge for withdrawals made within the first four years of the investments.

78.     To invest, Kiley instructed investors to write a check payable to "UBS," "UBS Diversified," or other entities that he controlled.

79.     Kiley and Cook did not give investors any financial information about UBS Diversified or Universal Brokerage, such as a financial statement.

## THE OXFORD OFFERINGS

80.     In or about April 2008, Cook began offering and selling investments in the foreign currency trading venture through Oxford Global Advisors.  Later, from approximately August 2008 through July 2009, he offered and sold the investments through Oxford Global Partners.

81.     Cook solicited investors through Oxford Global Partners' website, through investment seminars that he hosted, through a team of sales representatives, and through word of mouth.

82.     Cook also raised funds from clients of The Oxford Private Client Group, LLC, an investment adviser registered with the Commission and headquartered in the Van Dusen Mansion.

83.     Cook touted Oxford Global Advisors' and Oxford Global Partners' purported expertise and standing in the investment community. Cook's representations were false.

84.     Cook distributed Oxford Global Partners marketing materials which claimed that the firm had $4 billion in assets. Cook's claims were false.

85.     On the Oxford Global Partners website, Cook described the firm as "a world-class provider of investment management and risk management services" which provided "expert global financial strategies for our clients." Cook's statements were false.

86.     Cook promoted this image by hosting investment seminars in the Van Dusen Mansion and holding one-on-one meetings with prospective investors in the Mansion's largest office, which he filled with big screen televisions, multiple computers with many screens, and clocks set to multiple time zones.

87.     Cook represented to prospective investors that he would invest their money in foreign currency trading. Cook represented that the strategy involved trading the currencies of the G-5 countries. Cook's statements were false.

88.     Cook described the foreign currency trading venture in terms similar to those used by Kiley.

89.     Cook represented to investors that the trading strategy involved establishing a long position in one foreign currency and an offsetting short

position in a second foreign currency, and that because the positions offset, there was no market exposure. Cook's representations were false.

90.     Cook represented to some investors that the trading strategy realized a profit because the account containing the long position collected interest while the account containing the short position was not charged any interest because the account was located at an Islamic institution that complied with Shariah law. Cook's representations were false.

91.     Cook told other investors that his foreign currency venture utilized a complex computer program that had the ability to take advantage of pricing inequities between foreign currencies. Cook's representations were false.

92.     Cook consistently represented to investors that they would earn annual returns of over 10%. In April 2009, through the Oxford Global Partners website, Cook represented that the program was currently earning 10.5% per year. Cook's representations were false.

93.     Cook also touted the safety of the investment. One offering document disseminated by Cook represented that the trading strategy eliminated currency fluctuation risk and that investors' accounts would have "zero speculative positions at all times." Cook's representations were false.

94.     Cook also told investors that their funds were completely liquid and could be returned at any time. Cook's representations were false.

95.     Cook represented to investors that their funds would be placed in segregated accounts and not commingled with the money of other investors.

17

Through the Oxford Global Partners website, Cook represented that "[c]lient's funds are held in separately managed accounts." Cook's representations were false.

96.     Investors typically entered into a "Management Agreement" with Oxford Global Advisors or with Oxford Global Partners and gave Cook or his staff a check payable to "UBS," Oxford Global Advisors, Oxford Global Partners, or other entities which Cook controlled.

97.     Cook's representations regarding how he and his entities were to be compensated varied. The Management Agreements included an "entry fee" of .78%, a "management fee" equal to 2% of the assets invested, a "performance fee" equal to 20% of the profits generated, and a back-end "deferred sales charge" of 4%.

## INVESTMENTS THROUGH CROWN

98.     Beginning in approximately July 2008, Cook and Kiley began representing to new investors that their funds would be invested in the foreign currency trading venture through individually segregated accounts in each investor's name at Crown Forex, S.A., a foreign currency trading firm in Switzerland.

99.     Cook and Kiley instructed new investors to complete documents that purported to be Crown Forex, S.A. new account opening documentation.

100.    Cook and Kiley instructed new investors to make their checks payable to "Crown" or "Crown Forex."

101.    Cook and Kiley raised a total of $79 million from investors whom they told that the investors' funds would be invested at Crown Forex, S.A., including $32.7 million that Cook and Kiley took in during 2009.

102.    Cook and Kiley also represented to some existing investors that they would have new accounts at Crown Forex, S.A., where their funds would be invested in foreign currency trading.  Cook and Kiley's representations were false.

## COOK AND KILEY DID NOT SEGREGATE THE INVESTORS' FUNDS

103.    Cook and Kiley represented to their victims that each investor's funds would be deposited into a separate account in the investor's name and segregated from other investors' moneys.  Cook and Kiley's representations were false.

104.    In fact, Cook and Kiley, directly and acting through others, deposited investors' funds in U.S. bank accounts in the names of shell companies which they controlled, including UBS Diversified, Universal Brokerage, and Oxford Global Advisors.  In those accounts, investors' funds were commingled with funds of other investors and money received from other sources.

105.    Kiley and his office assistant were the only signatories on the bank accounts of UBS Diversified and Universal Brokerage.  Other associates of Cook and Kiley were signatories on the account of Oxford Global Advisors.

106.    Cook and Kiley represented to many of their victims that their money would be deposited into separate, segregated trading accounts at the Swiss firm Crown Forex, S.A.  Cook and Kiley's representations were false.

19

107. In fact, Cook and Kiley, directly and acting through others, deposited checks from many investors, into a U.S. bank account in the name of a domestic shell company, with a name—Crown Forex, LLC—that was misleadingly similar to the Swiss firm Crown Forex, S.A.

108. Cook and Kiley owned and/or controlled Crown Forex, LLC, which was unrelated to Crown Forex, S.A. In the domestic bank account of the shell company Crown Forex, LLC, investors' funds were commingled with funds of other investors and money received from other sources.

109. Kiley and his office assistant were the signatories on the Crown Forex, LLC domestic bank account.

110. Although he was not a signatory on the bank accounts described above, Cook made most decisions regarding the disposition of the funds in those accounts.

111. When investor checks were received, the checks were given to Cook. He determined which accounts the checks would be deposited into and directed others acting in concert with him to make the deposits.

112. Cook also directed the account signatories as to how the funds from the accounts should be disbursed.

113. Cook had a stamp bearing Kiley's signature, which he could use to personally make deposits, transfers and withdrawals.

114. On occasion, Kiley instructed his office assistant to send funds back to investors who had requested withdrawals.

## COOK AND KILEY MISAPPROPRIATED INVESTOR FUNDS

115.    As described above, Cook and Kiley represented to their victims that each investor's funds would be deposited into a separate, segregated account and used to trade foreign currencies for the investor. Cook and Kiley's representations were false.

### Ponzi Scheme Payments to Investors

116.    During the course of their scheme, Cook and Kiley, in effect operating a Ponzi scheme, disbursed approximately $51 million from accounts in which investor funds had been commingled to pay purported profits and principal to other investors.

117.    Cook and Kiley did not disclose that they were using commingled investor money to funds these payments.

### Use of Investor Funds for Personal Purposes

118.    Cook and Kiley diverted at least $42.8 million of their victims' money to their own personal purposes, including $18 million that Cook diverted to buy ownership interests in two trading firms; $12.8 million that Cook and Kiley transferred to bank accounts in Panama, purportedly to finance the construction of a casino; and $12 million that was used by Cook and Kiley for other personal purposes, including $4.8 million that Cook used for online gambling; $2.8 million used to purchase the Van Dusen Mansion; $2.7 million withdrawn in cash and cashier's checks; $1.3 million Cook and Kiley paid to their private attorneys; $1

million transferred to a private investment fund; and $1 million used to pay Cook and Kiley's personal credit cards.

119.    Kiley, who does not appear to have a personal bank account, routinely carried large sums of cash and spent large sums for an extensive wardrobe.

120.    Cook and Kiley did not disclose that they were using investor money for their personal purposes.

### Equity Investments in Trading Firms

121.    As described above, Cook used approximately $18 million to make equity investments for himself in two trading firms.

122.    Between December 1, 2006 and December 12, 2008, Cook sent $15 million to JDFX Holdings, Inc, ("JDFX Holdings"), a British Virgin Islands company headquartered in Switzerland, to purchase 35% of the company.

123.    In November 2008, Cook sent $3 million to Crown Forex, S.A. as an equity investment in the company.

124.    Cook did not disclose that he used investor money to make these investments for his own benefit.

### Foreign Currency Trading in Pooled Accounts Belonging to Cook and Kiley

125.    Cook and Kiley, directly and acting through others, transferred approximately $108 million of the investors' money to accounts at various trading firms.  However, Cook and Kiley did not place these funds in segregated accounts in the names of individual investors, as they had represented to investors.

22

126.    Instead, Cook and Kiley, directly and acting through others, pooled the investors' funds in accounts in the names of shell companies controlled by Cook and Kiley, including the Defendant Shell Companies and the Relief Defendant Shell Companies.  In those accounts, Cook and Kiley used pooled investor funds to trade foreign currencies in the names their own shell companies.

127.    From July 2006 to January 2009, Cook, directly or acting through others, transferred $46 million of investor funds to several trading accounts at PFG Best, Inc., a registered commodities brokerage firm based in Chicago ("PFG Best").

128.    Cook, directly or acting through others, caused the comingled investors funds to be placed in trading accounts in the names of Relief Defendants Oxford FX Growth, L.P. and Market Shot, LLC, both of which were controlled by Cook.

129.    Cook, directly and acting through others, used the commingled investor funds to invest primarily in foreign currencies.  The trading strategy Cook employed at PFG Best involved significant risk.

130.    The PFG Best accounts lost over $35 million, and only approximately $11 million was returned to bank accounts controlled by Cook and Kiley from the PFG Best accounts.

131.    From December 2006 to June 2009, Cook, directly and acting through others, caused approximately $38 million of comingled investor funds to be transferred to entities controlled by JDFX Holdings.

132.   JDFX Holdings was comprised of a subsidiary which purportedly had developed a high-speed computer platform for trading foreign currency and another entity which managed an investment fund called JDFX Fund.

133.   As described above, Cook used $15 million of investor funds to purchase a 35 % interest in JDFX Holdings.

134.   Cook used the remaining $23 million of investor funds at the JDFX Holdings entities to trade foreign currencies.  But contrary to his representations to investors, Cook engaged in risky trades involving highly volatile currencies of countries which are not members of the G-5 group of countries.

135.   Cook lost $9.6 million through his trading in the accounts with the JDFX Holdings entities.  Eventually, only about $13 million was returned from the JDFX entities to UBS Diversified, Oxford FX Growth, L.P., and Cook's personal account.

## PHONY ACCOUNT STATEMENTS

136.   From at least July 2006 through at least May 2009, Cook and Kiley, directly and acting through others, mailed investors individual account statements.

137.   The account statements disseminated to each investor by Cook and Kiley typically bore the name of the shell company through which the investor had invested.

138.     Each account statement also bore a purported individual account number, creating the false impression that each investor's money was being held in a segregated account.

139.     Beginning in approximately August 2008, Cook and Kiley, directly and acting through others, arranged for investors with purported accounts at Crown Forex, S.A. to have access to purported on-line account statements.

140.     The online account statements reflected the name of Crown Forex, S.A. and individual account numbers, creating the false impression that each investor's money was being held in a segregated account with Crown Forex, S.A.

141.     The paper and on-line account statements disseminated by Cook and Kiley falsely represented that the investors had earned profits during every period.

142.     Typically, the account statements represented that investors earned between approximately .8 and 1% return every month, closely matching the annual returns of 10% to 12% that Cook and Kiley had promised.

143.     The paper and on-line account statements disseminated by Cook and Kiley reflected no losses.

144.     Cook arbitrarily selected percentage rates every month or quarter and directed others to prepare account statements by applying those arbitrary percentages to the principal balances appearing in the investors' previous account statements.  In most months, Cook simply directed that the same percentage be applied to most of the accounts.

145.     As a result, Cook and Kiley's victims were misled into believing that their money was safely segregated in their own individual accounts and earning large, regular returns.

## CROWN FOREX

146.     As discussed above, beginning in or about June 2008 and continuing through in or about July 2009, Cook and Kiley raised $79 million from investors based on representations that the investors' funds would be deposited in segregated accounts and traded at the Swiss firm Crown Forex, S.A.

147.     In fact, from September 2006 through December 2008, Cook and Kiley transferred only about $23 million of the investors' funds to Crown Forex, S.A. in Switzerland.

148.     As discussed above, in or around November 2008, Cook acquired a 51% ownership interest in Crown Forex, S.A.  Cook used $3 million of investor funds transferred to pay for his ownership interest in Crown Forex, S.A.

149.     Cook, directly and acting through others, caused the balance of the investor funds to be deposited in a pooled account in the name of UBS Diversified and Crown Forex, LLC.

150.     None of the investor money was deposited in separate, segregated accounts in the names of individual investors.

151.     In December 2008, the Swiss Financial Market Supervisory Authority (" FINMA") instituted an action to investigate whether Crown Forex,

S.A., was in compliance with new Swiss laws requiring currency trading firms to register as banks.

152.    On December 24, 2008, FINMA ordered that Crown Forex, S.A. customers would not be able to withdraw funds without FINMA's consent and that Crown Forex, S.A. could no longer accept new clients.

153.    On February 23, 2009, FINMA ordered the liquidation of Crown Forex, S.A.

154.    On May 18, 2009, the FINMA determined Crown Forex, S.A. to be insolvent and formally declared the firm bankrupt.

155.    As the majority shareholder in Crown Forex, S.A., Cook was notified by FINMA about all of these events at or around the time they occurred.

156.    On or about December 16, 2008, Cook sent a letter to FINMA on behalf of Crown Forex, S.A.

157.    Cook and Kiley did not disclose any of the forgoing facts to investors until July, 2009.

158.    To the contrary, Cook and Kiley continued to solicit money from investors based on false representations that the investors' money would be deposited with Crown Forex, S.A.

159.    From January 1, 2009 through July, 2009, Cook and Kiley raised approximately $35.5 million based on false representations that the investors' money would be deposited in Switzerland with Crown Forex, S.A.

160.     To further conceal their fraud, until July 2009, when investors desired to withdraw money from Crown Forex, S.A., Cook instructed them to fill out documents which purported to be Crown Forex, S.A. withdrawal forms.  Cook then caused such investors to be paid with funds from domestic accounts controlled by Cook and Kiley.

161.     None of the investors in Cook and Kiley's foreign currency trading venture have accounts with Crown Forex, S.A.

## REPRESENTATIVE DEFRAUDED INVESTORS

### Anna Anile

162.     Anna Anile is a 56-year-old single mother of three who lives in New York.  Ms. Anile is a clerk in the dietician department of a local hospital.

163.     In early 2008, Ms. Anile started listening every week to a radio show called "Follow the Money" hosted by Defendant Kiley.  On the radio show, Kiley talked about the current economy and the decline of the stock market.  Kiley represented that he was telling the truth about the government, economy, and investing and that his investors were "truth-seekers" who were seeking the truth about these topics.

164.     Kiley said that investors should stop investing in the stock market through stock brokers who were making money even though their investors were losing money.  Kiley said that he ran a currency arbitrage program for large corporations for several years and that now individuals were able to invest in his program. Kiley said that he had 50 years of experience in investing and that his

investors were making double-digit returns.  He said that he was not like Madoff because investor funds were kept in segregated accounts in the investors' name and was available to be returned 24/7.

165.    Ms. Anile contacted Kiley in around August 2008 to get more information.  Kiley told Ms. Anile that he invested in foreign currencies and made money from the spreads between the currency prices.  He said that if she invested with him, her money would be invested in foreign currency arbitrage.  Kiley told Ms. Anile that he made money whether the market was up or down.

166.    During her phone call with Kiley, Ms. Anile told him that she was a single mother of three children, who made only $20,000 a year.  Ms. Anile could invest $17,000, her entire IRA savings which she had accumulated for 10 years.  Ms. Anile told Kiley that she did not have much tolerance for risk and that she could not afford to lose $17,000 in her IRA account because it was all the savings that she had.  Kiley said that making money without risk would not be a problem and that she would make double-digit returns each year.

167.    After the call, Kiley sent Ms. Anile a packet of brochures regarding his company Universal Brokerage FX and the currency program.

168.    Ms. Anile reviewed the brochures and spoke to Kiley's assistant Walter Buckner.  On or around September 18, 2008, Ms. Anile took $17,379.09 out of her individual retirement account and invested it in Kiley's program.

169.    After Ms. Anile invested, she received an account statement dated September 23, 2008 mailed from Universal Brokerage FX.  This statement

showed her investment minus an entry fee of $1,021 which had not been disclosed to her. Ms. Anile called Kiley's assistant Walter Buckner who told her that the fee was standard but that she would make it back in six months.

170.     From October 2008 until July 2009, Universal Brokerage FX mailed to Ms. Anile account statements showing that she was making a profit in her account every day.  These statements were titled "Crown Forex, S.A."

171.     In July 2009, Ms. Anile received a letter from Universal Brokerage FX saying that it had received subpoenas from the SEC, and it was not accepting investor funds.

172.     Ms. Anile learned that FINMA shut down Crown Forex, S.A. Ms Anile sent an email to Mr. Winkelmann who was working for FINMA on the case, asking him how she could get her money back from Crown Forex, S.A. Mr. Winkelman responded that Ms. Anile did not have an account at Crown Forex, S.A. and that there was nothing he could do for her.

173.     Ms. Anile has not received any money back from her investment with Universal Brokerage FX. Ms. Anile was not told that the money she invested with Universal Brokerage FX would be pooled with other investor funds or that it would be used for purposes other than foreign currency trading.

### James Cochran

174.     Mr. James Cochran is 61 years old and lives in California. Mr. Cochran is currently self-employed as the owner of a drywall contracting firm.

175.    Mr. Cochran first heard about Defendant Cook and his foreign currency investment program from a friend who had invested in the program.  In late September or early October 2008, Mr. Cochran went with his friend and their wives to Minneapolis, Minnesota to meet Cook.  They went to a meet with Cook and Grant Grybokwsi ("Grybowksi") who worked for Cook ("October Meeting").

176.    The October meeting was at Cook's office in the Van Dusen mansion in Minneapolis.  Cook explained to Mr. Cochran and his friend that his investment strategy involved foreign currency arbitrage.  He said that he took offsetting positions in foreign currencies and that he was able to make money by transacting with banks which followed Islamic law.  By doing so, Cook said that he was not required to pay interest or a fee to the Islamic bank for one part of the transaction.  By doing the transaction this way, Cook said he was able to make profits from his investments in foreign currencies.

177.    At the October meeting, Cook said that if Mr. Cochran invested in his foreign currency program, he would earn a guaranteed 10.5% return each year for four years.  Cook said that the profits Mr. Cochran earned would stay in the account and after four years he would receive back his principal plus the returns earned.  Cook said that the 10.5% return would come only from his foreign currency trading.  Cook said that Mr. Cochran's principal investment would never be at risk because the currency positions that he took offset each other.  Cook said that Mr. Cochran's money was liquid and that he could get his money back upon request within two to three days.

31

178.    At the October meeting, Cook also said that Mr. Cochran's money would be sent directly to Crown Forex, S.A., a foreign currency trading firm located in Switzerland. Cook said that Mr. Cochran's money would only be used to invest in foreign currency trading. Cook said that each investor's money is placed in separate accounts at Crown Forex, S.A. and that the foreign currency trading is conducted for each account. Cook explained to Mr. Cochran that a computer program made the trades in the accounts and that Cook oversaw the program.

179.    Cook told Mr. Cochran that he had to pay an up-front fee of 2% of the amount invested and then would not have to pay any additional fees or commissions unless he withdrew his money before the four years had passed.

180.    In November 2008, Mr. Cochran received a "Management Agreement" from Cook's office. The Management Agreement was between Mr. Cochran and his wife and Oxford Global Advisors which Cook told them was the company through which Cook was running his investment business. Mr. Cochran reviewed the Management Agreement and asked Grybowksi some questions about it. Mr. Cochran asked Grybowski whether his money was going to be invested in something other than foreign currency trading. Grybowski told Mr. Cochran that Addendum B to the Management Agreement provided what was going to happen with his money.

181.    No one from Oxford Global Advisors or Crown Forex, S.A. gave Mr. Cochran any financial information about the two companies or the foreign currency investment program, including balance sheets or income statements.

182.    Mr. Cochran decided to invest because Cook promised that the foreign currency investment involved no risk and he would earn a 10.5% annual profit. Mr. Cochran also relied upon Cook's representation that his money was going to be segregated from other investors' money. In November, Mr. Cochran signed the Management Agreement, and in December 2008 sent Cook a check for $200,000. Cook and Grybowski told Mr. Cochran to make the check out to Crown Forex. He also completed a Crown Forex, S.A. agreement.

183.    After Mr. Cochran made his investment, he viewed on-line account statements which he accessed at www.crownforex.com. The account statements showed his $200,000 investment. As time went on, the account statements on the website showed that Mr. Cochran was earning a profit every day. The amount of profit on the statement matched the 10.5% annual return that Cook had promised.

184.    In around February 2009, Mr. Cochran saw an Internet report stating that Crown Forex S.A. was having difficulty paying investors on time. Cook told him that the report was untrue and gave Mr. Cochran the telephone number of Shadi Swais who Cook told him was the CEO of Crown Forex S.A. In around February 2009, Swais told Mr. Cochran that the Internet reports about Crown Forex S.A.'s financial difficulties were false.

185.     Mr. Cochran decided to invest more money with Cook for foreign currency investing.  On February 9, 2009, Mr. Cochran signed a Management Agreement with Oxford Global Advisors and the same day and had his bank wire $800,000 to Crown Forex ("Second Management Agreement").  Cook told Mr. Cochran that all of his money would be sent directly to Crown Forex S.A. in Switzerland.

186.     On or about July 22, 2009, Grybowski told Mr. Cochran that Oxford Global Advisors posted a letter on its website stating that it could no longer conduct business and that Crown Forex S.A. in Switzerland was in bankruptcy.  That same day Mr. Cochran sent a request to Oxford Global Advisors and Crown Forex, S.A. asking that his money be returned.  Mr. Cochran has not received back any of my money.

187.     Neither Cook nor anyone else on behalf of Oxford Global Advisors or Crown Forex S.A. told Mr. Cochran that his money was going to be sent to a bank account in Minnesota and pooled with other investors' funds.  Mr. Cochran was not told that the money would be used for purposes other than investing in foreign currency trading.

**Thomas Hoel**

188.     Mr. Hoel is 50 years old and lives in Woodbury, Minnesota.  He owns and operates a physical and occupational therapy center which focuses on care for children with special needs.

34

189.     In around March 2009 a friend of Mr. Hoel told him about Defendant Kiley and his radio show called "Follow the Money." Mr. Hoel's friend told him that Kiley talked on the show about a foreign currency investment program that Kiley ran through a company called Universal Brokerage FX. According to Mr. Hoel's friend, Kiley said that his program made money whether the market was up or down.

190.     After talking with his friend, Mr. Hoel went onto Kiley's website, www.patkiley.com. On the website, Mr. Hoel sent an email to Kiley to get further information about the investment program. Kiley called Mr. Hoel a few days later to set up a meeting.

191.     In around March 2009, Mr. Hoel met with Kiley at the Universal Brokerage FX office in Egan, Minnesota. Kiley explained to him the investment program. Kiley said that he traded foreign currencies with his clients' money. He said that he used an arbitrage method of trading and that a proprietary software program he purchased conducted the trading. He said that his software program was more efficient in conducting the trading than anything else in the marketplace. Kiley said that Trevor Cook worked at Universal Brokerage FX and bought the software program.

192.     At the March meeting, Kiley said that if Mr. Hoel invested with him, Mr. Hoel would earn 1 to 1.5% per month. Kiley said that he had been earning 10 to 11% per year for the past six to seven years from his foreign currency trading. Kiley also told Mr. Hoel that the principal investment would be

placed in an account in Mr. Hoel's name, segregated from other investors, that Mr. Hoel would always have access to his money, and that Mr. Hoel could withdraw his money at any time. Kiley said that his trading strategy involved no risk. Kiley also said that after taking out an upfront fee of 5.8%, he only took money for himself after the investors were paid their returns.

193.    At the March meeting Kiley also gave Mr. Hoel two brochures explaining his investment program. Mr. Hoel read the brochures before investing with Kiley and underlined certain passages in the brochures.

194.    Mr. Hoel met with Kiley again in April 2009 when they further discussed the investment program.

195.    Neither Kiley nor anyone from Universal Brokerage FX asked Mr. Hoel about his income, net worth, or investment experience. Neither Kiley nor anyone from Universal Brokerage FX gave Mr. Hoel any financial information about Universal Brokerage FX such as financial statements or balance sheets.

196.    In around May 2009, Mr. Hoel met with Kiley at his offices in order to invest in his program. Mr. Hoel completed an account application for Crown Forex, S.A. Mr. Hoel also wrote two checks totaling $83,834.87 made out to Crown. Mr. Hoel gave the application and the checks to Kiley's assistant.

197.    In June 2009, Mr. Hoel invested an additional $12,000 in Kiley's investment program by giving Kiley a check made out to Crown Forex.

198.   Based on what Kiley told him, Mr. Hoel believed that his money was going to be deposited directly in an account in Mr. Hoel's name and traded in foreign currencies at Crown Forex, S.A. in Switzerland.

199.   After investing, Mr. Hoel received account statements in the mail from Universal Brokerage FX.

200.   On July 10, 2009, Mr. Hoel read an article in the Minneapolis Star Tribune regarding a lawsuit filed against Kiley, Cook and others. On or about July 11, 2009, Mr. Hoel and others met with Kiley and Kiley said that Mr. Hoel's money was not with Crown Forex and he could not say where the money was or whether his money was safe.

201.   Approximately two days later, Mr. Hoel sent Kiley's office a request to withdraw all of his money. Mr. Hoel has not received back any of the money that he invested. Mr. Hoel's wife, Margaret, invested IRA funds with Universal Brokerage FX and was able to retrieve her funds prior to them being transferred from the IRA custodian to Universal Brokerage FX.

202.   Mr. Hoel was not told that the money he invested with Universal Brokerage FX would be pooled with other investor funds or that it would be used for purposes other than foreign currency trading. If Mr. Hoel knew that his money would be pooled with other investor funds or used for purposes other than foreign currency trading, he would not have invested with Universal Brokerage FX.

**Edward Smisek**

203.    Mr. Edward Smisek is 61 years old and lives in Lonsdale, Minnesota.  Mr. Smisek is a farmer and self-employed grain broker.

204.    Mr. Smisek first heard about Defendant Cook and his foreign currency investment program from a friend, George Kasper ("Kasper").  Kasper worked for Cook at Oxford Global Partners.

205.    On April 1, 2009, Mr. Smisek went with Kasper to Minneapolis, Minnesota to meet Cook.  They attended an investment workshop wherein Cook, and several others, spoke to a group of 25 to 30 people ("Investment Workshop").

206.    The Investment Workshop was at the Oxford Global Partner's office which was in a Minneapolis at the Van Dusen mansion which was represented as being owned by Cook.

207.    Cook explained to Mr. Smisek that his investment strategy involved buying and selling of foreign currencies.

208.    Cook said that he had been running his foreign currency investment strategy for seven or eight years, and that he always made a profit from his trades.

209.    Cook said that he was the one who traded the foreign currencies for Oxford Global Partners.

210.    Cook said that the trading involved taking advantage of price differences in foreign currencies such as the Euro and the Yen.

211.    He said that he made trades frequently but that he would only make trades if they were profitable.

212.    Cook said that investments in the foreign currency program would earn a 10.5% return each year.

213.     At the Investment Workshop, Cook said that Mr. Smisek's money would only be invested in foreign currency trading.

214.    At the Investment Workshop, Cook said that investor funds would be sent to a Swiss bank account and traded at Crown Forex, S.A., in Switzerland.

215.    Cook said that sending the money to a Swiss bank account made it a safe investment.

216.    Cook said that Mr. Smisek's principal investment would never be at risk.

217.    Cook said that Mr. Smisek could get his money back any time he wanted, but if he took it out before a certain amount of time there would be a fee.

218.    Cook repeatedly told Mr. Smisek that the investment was completely safe.

219.    Cook said that his investment program was "not a Madoff or Petters situation."

220.    At the Investment Workshop, Mr. Smisek was given some brochures about the investment strategy.

221.    After the Investment Workshop ended, Mr. Smisek spoke with Cook personally.

222.     Mr. Smisek asked Cook what could go wrong if he invested money in foreign currencies with him. Cook told him "nothing."

223.     Cook then repeated that Mr. Smisek's investment was going to be in a Swiss bank account, that it was going to be used to trade foreign currencies, and that it would not be at any risk.

224.     Mr. Smisek decided to invest mostly because Cook promised that the foreign currency investment involved no risk, he would earn a 10.5% annual profit, and his money was kept in an individual account at a Swiss bank.

225.     Before he invested, Mr. Smisek was given account documentation to complete. He completed a form to open an individual account at Crown Forex, S.A. in Switzerland. He also completed an agreement between himself and Oxford Global Advisors.

226.     On May 14, 2009, Mr. Smisek invested $111,669 in Cook's foreign currency program. To make that investment, Mr. Smisek liquidated a certificate of deposit that he kept at a local bank for his retirement.

227.     After Mr. Smisek invested his money with Cook, his friend Kasper gave him a print-out of an account statement from Crown Forex, S.A dated July 1, 2009.

228.     In around July 2009, Mr. Smisek read a news article describing problems with the foreign currency investment program.

229.     Neither Cook nor anyone else on behalf of Oxford Global Partners, Oxford Global Advisors, or Crown Forex S.A. told Mr. Smisek that his money

was going to be sent to a bank account in Minnesota. Mr. Smisek was not told
that the money would be used for purposes other than investing in foreign
currency trading.

### CURRENT SITUATION

230.    Only about $32 million was ever returned from the firms at which
Cook and Kiley held pooled trading accounts. Cook and Kiley have dissipated
much of that $32 million.

231.    On May 18, 2009, the FINMA determined Crown Forex, S.A. to
be insolvent and formally declared the firm bankrupt and permitted the firm to file
an appeal within 30 days of being notified of the decision.

232.    Cook is believed to own an interest in two properties in Panama
City, Panama for the purpose of developing the property into a hotel-casino. The
status of the properties is unknown.

233.    As of August 31, 2009 only about $1.9 million remained in the
domestic bank accounts, including the accounts of UBS Diversified, Universal
Brokerage, Oxford Global Partners, Oxford Global Advisors, Basel Group, LLC,
Crown Forex, LLC.

### COUNT I

**Violations of Section 5(a) and (c) of the Securities Act**
**[15 U.S.C. § 77e(a) and (c)]**
**(Against Cook, Kiley, and the Defendant Shell Companies)**

234.    Paragraphs 1 through 233 above are realleged and incorporated
herein by reference as though fully set forth herein.

41

235. By engaging in the conduct described above, Cook, Kiley, and the Defendant Shell Companies, directly or indirectly: (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

236. No valid registration statement was filed or was in effect with the Commission in connection with offer and sale by Cook, Kiley, and the Defendant Shell Companies of securities issued by the Defendant Shell Companies.

237. By reason of the foregoing, Cook, Kiley, and the Defendant Shell Companies have violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## COUNT II

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]
### (Against Cook, Kiley, and the Defendant Shell Companies)

238. Paragraphs 1 through 233 are realleged and incorporated by reference as though fully set forth herein.

239.    By engaging in the conduct described above, Cook, Kiley, and the

Defendant Shell Companies, in the offer and sale of securities, by the use of the

means and instruments of transportation or communication in interstate commerce

or by use of the mails, directly or indirectly, have employed devices, schemes and

artifices to defraud.

240.    Cook, Kiley, and the Defendant Shell Companies acted with

scienter.

241.    By reason of the foregoing, Cook, Kiley, and the Defendant Shell

Companies violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### COUNT III

**Violations of Sections 17(a)(2) and (3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and (3)]**
**(Against Cook, Kiley, and the Defendant Shell Companies)**

242.    Paragraphs 1 through 233 are realleged and incorporated by

reference as though fully set forth herein.

243.    By engaging in the conduct described above, Cook, Kiley, and the

Defendant Shell Companies, in the offer and sale of securities, by the use of the

means and instruments of transportation or communication in interstate commerce

or by use of the mails, directly or indirectly, have:

      a.  obtained money or property by means of untrue statements of

          material fact or by omitting to state material facts necessary in order

          to make the statements made, in light of the circumstances under

          which they were made, not misleading; and

b.  engaged in transactions, practices, or courses of business that

operated or would operate as a fraud or deceit upon the purchasers of

such securities.

244.    By reason of the foregoing, Cook, Kiley, and the Defendant Shell

Companies have violated Sections 17(a)(2) and (3) of the Securities Act [15

U.S.C. §§ 77q(a)(2) and (3)].

### COUNT IV

**Violations of Section 10(b) of the Exchange Act,
and Exchange Act Rule 10b-5
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
(Against Cook, Kiley, and the Defendant Shell Companies)**

245.    Paragraphs 1 through 233 are realleged and incorporated by

reference as though fully set forth herein.

246.    By engaging in the conduct described above, Cook, Kiley, and the

Defendant Shell Companies, in connection with the purchase and sale of

securities, by the use of the means and instrumentalities of interstate commerce

and by the use of the mails, directly and indirectly: used and employed devices,

schemes and artifices to defraud; made untrue statements of material fact and

omitted to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; and

engaged in acts, practices and courses of business which operated or would have

operated as a fraud and deceit upon purchasers and sellers and prospective

purchasers and sellers of securities.

247.    Cook, Kiley, and the Defendant Shell Companies acted with scienter.

248.    By reason of the foregoing, Cook, Kiley, and the Defendant Shell Companies violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT V

### (Relief Defendants)

249.    Paragraphs 1 through 248 are realleged and incorporated by reference.

250.    Cook and Kiley transferred millions from accounts, in which funds illegally obtained from investors had been commingled, to the Relief Defendants.

251.    Cook and Kiley, directly and acting through others, transferred at least approximately $500,000, derived through their illegal conduct, to Relief Defendant Basel Group, LLC.

252.    Cook and Kiley, directly and acting through others, transferred at least approximately $79 million, derived through their illegal conduct, to Relief Defendant Crown Forex, LLC.

253.    Cook and Kiley, directly and acting through others, transferred at least approximately $9.7 million, derived through their illegal conduct, to Relief Defendant Market Shot, LLC.

254.     Cook and Kiley, directly and acting through others, transferred at least approximately $3.5 million, derived through their illegal conduct, to Relief Defendant PFG Coin and Bullion.

255.     Cook and Kiley, directly and acting through others, transferred at least approximately $140,000, derived through their illegal conduct, to Relief Defendant Oxford Developers, S.A.

256.     Cook and Kiley, directly and acting through others, transferred at least approximately $29.6 million, derived through their illegal conduct, to Relief Defendant Oxford FX Growth, L.P.

257.     Cook and Kiley, directly and acting through others, transferred at least approximately $8.4  million, derived through their illegal conduct, to Relief Defendant Oxford Global FX, LLC

258.     Cook and Kiley, directly and acting through others, transferred at least approximately $1.2 million, derived through their illegal conduct, to Relief Defendant Oxford Global Managed Futures Fund, L.P.

259.     Cook and Kiley, directly and acting through others, transferred at least approximately $1,000, derived through their illegal conduct, to Relief Defendant UBS Diversified FX Advisors, LLC.

260.     Cook and Kiley, directly and acting through others, transferred at least approximately $4.7 million, derived through their illegal conduct, to Relief Defendant UBS Diversified FX Growth, L.P.

261.    Cook and Kiley, directly and acting through others, transferred at least approximately $1,000, derived through their illegal conduct, to Relief Defendant UBS Diversified FX Management, LLC.

262.    Cook and Kiley, directly and acting through others, transferred at least approximately $948,848 derived through their illegal conduct, to Relief Defendants Clifford Berg and Ellen Berg.

263.    The monies received by the Relief Defendants from Defendants Cook and Kiley constituted ill-gotten gains from the fraud of Defendants Cook, Kiley, and the Defendant Shell Companies as alleged in this Complaint.

264.    The Relief Defendant Shell Companies and Relief Defendants Clifford Berg and Ellen Berg have no legitimate claim to the ill-gotten funds they received from Defendants Cook and Kiley or to any assets that the Relief Defendant Shell Companies and Relief Defendants Clifford Berg and Ellen Berg acquired with those ill-gotten funds.

## **RELIEF REQUESTED**

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants Cook, Kiley, and the Defendant Shell Companies committed the violations charged and alleged herein.

### II.

Grant Orders of Preliminary and Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining Defendants Cook, Kiley, and the Defendant Shell Companies, their agents, servants, employees, attorneys and those persons in active concert or participation with him who receive actual notice of the Orders, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder,.

### III.

Issue an Order requiring the Defendants and the Relief Defendants to disgorge the ill-gotten gains that they received as a result of the violations alleged in this Complaint, including prejudgment interest.

### IV.

With regard to the violative acts, practices and courses of business set forth herein, issue an Order imposing upon Cook, Kiley, and the Defendant Shell Companies appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant appropriate emergency relief to prevent further secretion or dissipation of assets purchased with investor funds.

## VII.

Grant an Order for any other relief this Court deems appropriate.

Respectfully submitted,

Dated: November 23, 2009

John E. Birkenheier
Adolph J. Dean, Jr.
Steven L. Klawans
Justin M. Delfino
Attorneys for Plaintiff
U.S. Securities and Exchange
Commission
Chicago Regional Office
175 West Jackson Blvd.
Suite 900
Chicago, Illinois 60604
T. 312-353-7390
F. 312-353-7398

Robyn A. Millenacker

Assistant United States Attorney
District of Minnesota
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN
T. 612-664-5600
F. 612-664-5788
Local Counsel