IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

U.S. COMMODITY FUTURES
TRADING COMMISSION,
        Plaintiff,

v.                                           Case No.     09-cv-3332 (MJD/JSM)

TREVOR COOK et al.,
        Defendants,

R.J. ZAYED,
        Receiver.

---

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,
        Plaintiff,

v.                                           Case No.     09-cv-3333 (MJD/JSM)

TREVOR G. COOK, et al.,
        Defendants,

R.J. ZAYED,
        Receiver.

---

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,
        Plaintiff,

v.                                         Case No.     11-cv-574 (MJD/FLN)

JASON BO-ALAN BECKMAN, et al.,
        Defendants,

R.J. ZAYED,
        Receiver.

**RECEIVER'S MEMORANDUM IN SUPPORT OF MOTION TO ENJOIN DISTRIBUTION OF SETTLEMENT PROCEEDS TO THE FINRA CLAIMANTS**

These cases concern one of the biggest Ponzi schemes in Minnesota history, involving hundreds of investors who lost over $150 million to a fraud involving Trevor Cook, Bo Beckman, and others ("Ponzi Scheme"). The Court has appointed the Receiver, R.J. Zayed ("Receiver"), to identify, preserve and recover assets and equitably distribute them to the victims of the fraud. The Receiver has thus far located, collected, liquidated, or frozen roughly $9,475,477 and distributed $2,653,520 on a *pro rata* basis to nearly 700 defrauded investors—including the twelve defrauded investors at issue in this motion. *Eighth Status Report of Receiver R.J. Zayed in CFTC v. Cook et al. (09-cv-3332) and SEC v. Cook et al. (09-cv-3333)* dated April 7, 2011, Docket No. 733, at 5.

This motion seeks to prevent twelve defrauded investors ("FINRA Claimants") from taking $3.4 million from a Receivership asset for themselves. The FINRA Claimants are trying to collect nearly $800,000 more than the $2.6 million that the Receiver has distributed to all victims, including the FINRA Claimants. They filed arbitration actions with the Financial Industry Regulatory Authority ("FINRA") seeking damages from Jason Bo-Alan Beckman ("Beckman"), NRP Financial, Inc. ("NRP"), and Western International Securities, Inc. ("Western") for their roles in the Ponzi Scheme and the financial losses attendant thereto.

Beckman was a partner of Cook, associated with FINRA, and affiliated with NRP and Western – both FINRA member broker dealers. Beckman, while under the supervision and sponsorship of NRP and Western, marketed, recruited, and convinced

approximately one hundred and fifty investors to pour over $47 million of their lifesavings into the Ponzi Scheme.[1] *Memorandum in Support of U.S. SEC's Motion for an Asset Freeze, Appointment of a Receiver, Preliminary Injunction, and Other Ancillary Relief*, No. 11-cv-0574, dated March 7, 2011, Docket No. 3, at 1. Because of their relationship with Beckman, NRP and Western were obligated to supervise him pursuant to state and federal securities law, FINRA rules and industry practice, and under common law. NRP and Western failed to do so, permitting Beckman to recklessly and fraudulently invest client funds in the Ponzi Scheme through the Cook and Beckman entities. Beckman's conduct, facilitated by NRP and Western's abdication of their supervisory responsibilities, caused massive losses to the Receivership entities and to hundreds of investors.

The Receiver is mandated to secure and preserve Receivership assets for equitable distribution and the investors are prohibited from pursuing self help. The FINRA Claimants have negotiated a settlement with Beckman, NRP, and Western worth at least $3.4 million. But payment of that money would diminish a Receivership asset, i.e., the Receiver's own damage claim against NRP and Western for the same losses. The $3.4 million was secured by investor self help and would jeopardize the remaining victims' chance for recovery from NRP and Western; it further would compromise the Court's plan for equitable distribution for all victims of the fraud. Although the Receiver does

---

[1] For further information regarding Beckman's conduct and role in the Ponzi Scheme, *see Memorandum in Support of U.S. SEC's Motion for an Asset Freeze, Appointment of a Receiver, Preliminary Injunction, and Other Ancillary Relief*, No. 11-cv-0574, dated March 7, 2011, Docket No. 3, at 3-20.

not dispute that the FINRA Claimants suffered losses in the Ponzi Scheme, their losses arise from the same wrongful conduct giving rise to the Receiver's claim against NRP and Western, and will be included in the Receiver's damage calculation. The FINRA Claimants themselves filed claims with the Receivership seeking recompense from the Receiver for the exact same losses, and have received their *pro rata* share of the Court-ordered distribution.

The Receiver therefore requests that the Court enter an Order enjoining (1) the $3.4 million from being distributed to the FINRA Claimants (specifically, $500,000 from Western, $1.5 million from NRP, and $1.4 million from the United States Fire Insurance Company ("U.S. Fire")); and (2) enjoin the FINRA Claimants from pursuing money in an undetermined amount from Everest Indemnity Insurance Company and potential additional money from other Beckman, NRP, and/or Western insurers, as contemplated by the settlement agreements discussed herein ("Settlement Proceeds").

I.  **FACTUAL BACKGROUND**

   A.  **The Cook Receivership Was Created To Preserve Assets In Order To Equitably Recompense All Victims Of The Ponzi Scheme**

On November 23, 2009, the United States Securities and Exchange Commission ("SEC") and the United States Commodity Futures Trading Commission ("CFTC") filed lawsuits against Trevor Cook, Patrick Kiley, Oxford Global Advisors, LLC ("OGA"), and various entities controlled by them. *Complaint*, No. 09-cv-3333 ("Cook SEC case"), Docket No. 1 (Nov. 23, 2009); *Complaint for Injunctive and Other Equitable Relief and*

4

*for Penalties under the Commodity Exchange Act*, No. 09-cv-3332 ("Cook CFTC case"), Docket No. 1 (Nov. 23, 2009).

On November 23, 2009, the Court established the Receivership in the related Cook SEC and Cook CFTC cases.  *See Order Appointing Receiver*, No. 09-cv-3333, Docket No. 13 (Nov. 23, 2009); *see also Amended Order Appointing Receiver*, No. 09-cv-3333, Docket No. 18 (Nov. 24, 2009); *Second Amended Order Appointing Receiver*, No. 09-cv-3333, Docket No. 68 (Dec. 11, 2009); *Order Imposing Asset Freeze and Other Ancillary Relief*, No. 09-cv-3333, Docket No. 14 (Nov. 23, 2009); *Order Identifying Frozen Accounts*, No. 09-cv-3333, Docket No. 15 (Nov. 23, 2009); Ex Parte *Statutory Restraining Order*, No. 09-cv-3332, Docket No. 21 (Nov. 23, 2009); *Order Continuing Appointment of Temporary Receiver*, No. 09-cv-3332, Docket No. 96 (Dec. 11, 2009).

The purpose of the Cook Receivership is to marshal, preserve, account for and liquidate the assets of the Receivership for the benefit of the investors who were defrauded by the Ponzi Scheme.  *See, e.g., Order Continuing Appointment of Temporary Receiver*, No. 09-cv-3332, Docket No. 96, at 3.  To that end, the Court conferred certain powers and duties on the Receivership, as well as certain limitations on investors, including the FINRA Claimants.  *See, e.g., Second Amended Order Appointing Receiver*, No. 09-cv-3333, Docket No. 68, at 2-4.

With respect to the Receiver's powers and duties, the Court mandated that the Receiver preserve all assets of the Receivership.  The Court imposed on the Receiver the duty "[t]o take such action as necessary and appropriate to prevent the dissipation . . . of any funds or assets or for the preservation of any such funds and assets of the Receiver

5

Estates." *Id.* at 3; *see also Order Continuing Appointment of the Temporary Receiver*, No. 09-cv-3332, Docket No. 96 at 4.

With respect to the investors' limitations, the Court foreclosed them from continuing or settling lawsuits, engaging in self-help, or interfering with the Receiver's attempts to take control of certain assets. The Court stayed the investors from:

> A. Commencing, prosecuting, continuing, or enforcing any suit or proceeding affecting any of the Defendants, Relief Defendants, or Receiver Estates;
>
> B. Using self-help . . . for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any assets of the Receiver Estates…
>
> …
>
> D. Doing any act that may interfere with the taking control, possession, or management, by the Receiver, of any assets of the Receiver Estates …

*Second Amended Order Appointing Receiver*, No. 09-cv-3333, Docket No. 68, at 6-7; *see also Order Continuing Appointment of the Temporary Receiver*, No. 09-cv-3332, Docket No. 96, at 7-8; *Order Imposing Asset Freeze and Other Ancillary Relief*, No. 09-cv-3333, Docket No. 14, at 8-9. Moreover, the Court entered a separate order which froze "any and all assets . . . in whatever form such assets may presently exist," held for the benefit of Cook or any other Receiver or related entity. *Order Imposing Asset Freeze and Other Ancillary Relief*, No. 09-cv-3333, at 3.

The FINRA Claimants have sought to take advantage of the benefits conferred by these Orders as they have each filed a claim with the Cook Receivership requesting

recompense through civil restitution for the same $14.5 million they sought in the FINRA arbitrations.

> **B.  The Beckman Receivership Was Created To Preserve Assets In Order To Equitably Recompense All Victims Of Beckman's Fraudulent Conduct**

On March 7, 2011, the SEC filed a lawsuit against Jason Bo-Alan Beckman, The Oxford Private Client Group, LLC ("OPCG"), and Hollie Beckman.  *Complaint*, No. 11-cv-0574 ("Beckman SEC case"), Docket No. 1 (March 7, 2011).

On March 8, 2011, the Court established the Receivership in the Beckman SEC case.  *See Order Imposing Asset Freeze and Other Ancillary Relief*, No. 11-cv-0574, Docket No. 9 (March 8, 2011); *Order Appointing Receiver*, No. 11-cv-0574, Docket No. 10 (March 8, 2011); *see also Order of Preliminary Injunction, Asset Freeze, and Other Ancillary Relief as to Defendant Jason Bo-Alan Beckman*, No. 11-cv-0574, Docket No. 20 (March 11, 2011).

The purpose of the Beckman Receivership is the same as the Cook Receivership, *i.e.*, to marshal, preserve, account for and liquidate the assets of the Receivership for the benefit of the investors who were defrauded.  *See e.g.*, *Order Appointing Receiver*, No. 11-cv-0574, Docket No. 10, at 2-3.  The Court conferred the same powers and duties on the Receiver as in the Cook Receivership, including "[t]o take such action as necessary and appropriate to prevent the dissipation . . . of any funds or assets or for the preservation of any such funds and assets of the Receiver Estates." *Id*. at 3.

Similarly, the Court foreclosed the investors from:

> A.    Commencing, prosecuting, continuing, settling, or enforcing any suit, proceeding, award, judgment, settlement or lien against or affecting any of the Receiver Estates;
>
> B.    Using self-help . . . for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any assets of the Receiver Estates…
>
> …
>
> D.    Doing any act that may interfere with the taking control, possession, or management, by the Receiver, of any assets of the Receiver Estates, diminish the value of the assets of the Receiver Estates…

*Id*. at 6-7; *see also Order Imposing Asset Freeze and Other Ancillary Relief*, No. 11-cv-0574, Docket No. 9 at 10.  The Court also entered a separate Order that froze "any and all assets . . . in whatever form such assets may presently exist," held for the benefit of Beckman, OPCG, or Hollie Beckman, including "insurance policies or proceeds for which any Defendant [Beckman or OPCG], Relief Defendant [Hollie Beckman], and/or Related Entity is a covered person or beneficiary."  *Id*. at 2-3, 9.

### C.    The FINRA Claimants Pursued Self-Help To Recover Their Losses

#### 1.    The FINRA Arbitrations

The FINRA Claimants filed two separate arbitration actions.  The first FINRA arbitration was filed by Dale and Ann Woodbeck, David Dent, Justin Bussler, Laura Owen, Ronald Bisson, Sr. (the "Woodbeck Claimants") on November 17, 2009.  (Declaration of Samuel T. Lockner ("Lockner Decl."), ¶ 2; Ex. 1.)  The Woodbeck Claimants asserted claims against Beckman, NRP and Western for violations of federal and Minnesota State securities laws, fraudulent misrepresentation, negligent

misrepresentation, breach of fiduciary duty, conversion, and common law respondeat superior and negligent supervision. (*Id*. at 24-31.) Their allegations, and claim for damages, arise from their client relationship with Beckman, and his affiliation with NRP and Western, who lured them into investing money in the Ponzi Scheme. (*See, e.g., id.* at 2-4, 16-18.) The Woodbeck Claimaints alleged losses of $1.66 million. (*Id*. at 31-32.) These are the same losses for which the Woodbeck Claimants have submitted claims to the Receiver.

The second FINRA action was filed by Anne E. Quiggle, Susan R. Gorman and Evangeline M. Olson, individually and as Trustees on behalf of the Arthur W. Quiggle Family Trust on April 21, 2010. (Lockner Decl., ¶ 3; Ex. 2.) They filed an amended complaint on July 15, 2010, including Charlotte Olson, individually and as Trustee on behalf of the Charlotte J. Olson Family Trust and the Charlotte J. Olson Charitable Remainder Trust (the "Quiggle Claimants"). (Lockner Decl., ¶ 4; Ex. 3.) The Quiggle Claimants asserted the same claims against Beckman, NRP, and Western as the Woodbeck Claimants, and further asserted a claim for "unsuitability." (*Id*. at 25-34.) Their allegations, and claim for damages, also arise from their client relationship with Beckman, and his affiliation with NRP and Western, who lured them into investing money in the Ponzi Scheme. (*See, e.g., id.* at 2-5, 9-20.) The Quiggle Claimaints alleged losses of at least $12.91 million. (*Id*. at 34-35.) These are the same losses for which the Quiggle Claimants have submitted claims to the Receiver.

## 2. The FINRA Settlement Agreements

The FINRA Claimants collectively settled their arbitrations with Beckman, NRP and Western through three separate settlement agreements. The first settlement was entered into by the FINRA Claimants and Western around February 8, 2011. (Lockner Decl., ¶ 5; Ex. 4.) Western agreed to pay the FINRA Claimants $495,500. (*Id.* at 3.) It further required Western to not block or otherwise interfere with the FINRA Claimants attempts to secure additional funds from any insurance policy available to Beckman and Western. (*Id.* at 3.)

The second settlement was entered into by the FINRA Claimants and NRP on February 28, 2011. (Lockner Decl., ¶ 6; Ex. 5.) This dispute was resolved for $7,175,000 plus interest, attorneys' fees and costs. (*Id.* at 2.) NRP agreed to pay $1.5 million, NRP's insurer U.S. Fire agreed to pay $1.4 million, and the remaining $4.275 million was to be pursued by the FINRA Claimants from other insurers of NRP, namely Scottsdale Insurance Company and Everest Indemnity Insurance Company. (*Id.*)

The third settlement was entered into by the FINRA Claimants and Beckman on February 28, 2011. (Lockner Decl., ¶ 7; Ex. 6.) Beckman agreed to pay via an insurance policy that covers him and NRP ninety-one (91%) of the difference between any money available for use by Beckman or NRP from the Everest policy minus $170,000.[2] (*Id.* at 2.) The $170,000 was deducted for Beckman's defense or other costs he may incur in connection with any investigations or litigations. (*Id.* at 3.) Beckman represented that he

---

[2] The equation for this calculation is: $(91\% (X - \$170,000)) = \text{payment amount}$.

believed approximately $800,000 was available via the Everest policy, suggesting the FINRA Claimants would receive approximately $573,000.[3] (*Id*. at 2.)

Thus, the settlement agreements would provide the FINRA Claimants with: (1) $495,500 from Western; (2) $1.5 million from NRP; and (3) $1.4 from the U.S. Fire;[4] (4) money in an undetermined amount from Everest Indemnity Insurance Company (possibly approximately $573,000); and (5) potentially additional money from other Beckman, NRP, and/or Western insurers.[5]

### D. The Receiver Advised The FINRA Parties Of The Court's Orders FINRA Claimants

The Receiver learned of the impending FINRA settlements by a letter dated January 12, 2011 from U.S. Fire. (Lockner Decl., ¶ 15; Ex. 14.) In that letter, U.S. Fire asserted a claim against the Receiver for civil restitution based on its proposed settlement payment to the FINRA Claimants. (*Id*.)

In response, the Receiver wrote back to all counsel, expressly notifying them of the Court's Orders in these cases. The Receiver explained that,

> [u]nder the Court's Orders, 'all investors, borrowers, creditors, and other persons, and all others acting on behalf of any such investor, borrower, creditor or other persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees and attorneys,

---

[3] Assuming Beckman's belief regarding the $800,000 is correct, the calculation would be: (91% ($800,000 – $170,000)) = $573,300.

[4] These funds, totaling $3.4 million, are currently being held in escrow by the law firm of Lindquist & Vennum pending resolution of the instant motion. (Lockner Decl., ¶¶ 8-10, Exs. 7-9.)

[5] The term "Settlement Proceeds," as used herein, is meant to encompass all (5) listed entitlements under the three settlement agreements.

11

>are stayed from,' *inter alia,* '[c]ommencing, prosecuting, continuing or enforcing any suit or proceeding ...***affecting*** any of the Defendants, Relief Defendants, or Receiver Estates.'

(Lockner Decl., ¶ 11; Ex. 10 at 2, quoting *Second Amended Order Appointing Receiver*, No. 09-cv-3333, Docket No. 68, at ¶ VII.A)(emphasis in original.) The Receiver further explained that any distribution of the Settlement Proceeds would negatively affect the Receiver Estates. (*Id.*) Thereafter, and despite the Receiver's notification, the FINRA Claimants finalized the second and third settlement agreements listed above.

The Receiver subsequently notified counsel for the FINRA Claimants that the Settlement Proceeds were frozen under the Court Orders. (Lockner Decl., ¶ 14; Ex. 13.)

## II. LEGAL ARGUMENT

The Court has inherent authority to enforce compliance with its own orders. *See, e.g.*, *Shillitani v. United States*, 384 U.S. 364, 370 (1966). The Court should enjoin the Settlement Proceeds from being distributed because they were secured in violation of the Court's Receivership Orders. *See Order Imposing Asset Freeze and Other Ancillary Relief*, No. 11-cv-574, Docket No. 9 (March 8, 2011); *Order Appointing Receiver*, No. 11-cv-574, Docket No. 10 (March 8, 2011); *Order of Preliminary Injunction, Asset Freeze, and Other Ancillary Relief as to Defendant Jason Bo-Alan Beckman*, No. 11-cv-574, Docket No. 20 (March 11, 2011); *Order Imposing Asset Freeze and Other Ancillary Relief*, No. 09-cv-3333, Docket No. 14 (November 23, 2009); *Order of Preliminary Injunction, Asset Freeze, and Other Ancillary Relief*, No. 09-cv-3333, Docket No. 15 (December 8, 2009); *Second Amended Order Appointing Receiver*, No. 09-cv-3333,

Docket No. 68 (December 11, 2009); Order Continuing Appointment of Temporary Receiver, No. 09-CV-3332, Docket No. 96 (December 11, 2009).

### A. The Court Should Enjoin Distribution Of The Settlement Proceeds Because It Would Deplete A Receivership Asset

The Court mandated the Receiver take action to prevent the dissipation of any Receivership asset. *Second Amended Order Appointing Receiver*, No. 09-cv-3333, Docket No. 68, at 2-4 ("[t]o take such action as necessary and appropriate to prevent the dissipation . . . of any funds or assets or for the preservation of any such funds and assets of the Receiver Estates"); *see also Order Continuing Appointment of the Temporary Receiver*, No. 09-cv-3332, Docket No. 96 at 3-5; *Order Appointing Receiver*, No. 11-cv-0574, Docket No. 10, at 3. The Settlement Proceeds constitute a Receivership asset for at least two reasons: (1) the proceeds are part and parcel of the Receiverships' damage claim against NRP and Western, and (2) the proceeds include money from insurance policies held for the benefit of Beckman.

### 1. The $3.4 Million Payout Would Deplete A Receivership's Asset: A Damage Claim Against NRP And Western

The Receiver has a damage claim against NRP and Western. Beckman, an owner of at least part of OPCG and OGA and a partner of Cook, was a vital cog of the Ponzi Scheme, using the veneer of respectability and responsibility of NRP and Western to promote the scheme and providing, among other things, necessary funding to enable the fraud to continue, ensnaring more victims, and causing more money to vanish. NRP and Western were obligated to supervise Beckman. They did not. Whether due to gross negligence, recklessness, or intentional conduct, NRP and Western did not properly

13

supervise Beckman's conduct, permitting more investors to be lured in via Receivership entities, including OPCG and OGA. Based on the foregoing, the Receiver believes that it has a number of claims on behalf of Receivership entities against NRP and Western for their transgressions and involvement with the Ponzi Scheme. *See Second Amended Order Appointing Receiver*, No. 09-cv-3333, Docket No. 68 at 3; *Order Appointing Receiver*, No. 11-cv-0574, Docket No. 10 at 3 (The Receiver has the right to "bring such legal actions . . . he deems necessary . . . in discharging his duties as Receiver.").

The Receiver believes that total damages for claims against NRP and Western could rise to roughly $150 million. This figure comes from the losses sustained by Cook and Beckman Receivership entities, which were used to funnel, divert, or direct investor money to the Ponzi Scheme. Critical to this motion, the $150 million claim ***includes*** the same losses that the FINRA Claimants suffered and sought to dually recover from both the Receiver and the FINRA arbitrations. The very same money the FINRA Claimants lost to the Ponzi Scheme was first funneled through and then lost by Receivership entities.

Because the Receiver's damage claim against NRP and Western is an asset, the Receiver is obligated to preserve it and avoid its depletion. The distribution of the $3.4 million would negatively affect this asset for three reasons. First, the Receiver might not be able to secure full payment for a judgment on its damage claim. NRP and Western do not have limitless resources; and their insurance policies have limits. The Receiver does not know NRP's or Western's current financial position, nor does it know whether either could satisfy a $150 million judgment. For certain, the potentially implicated insurance

agreements, including U.S. Fire (which has agreed to pay $1.4 million), have policy limits. By the FINRA Claimants seeking to seize the $3.4 million (and possibly more), they are seizing a limited resource ahead of the remaining investors, jeopardizing the remaining investors' chance to recoup their losses.

Second, the Receiver's damage claim could be reduced due to the FINRA Claimants' arbitration claims. The FINRA Claimants filed claims with the Receivership seeking civil restitution for the same $14.5 million they sought in the arbitrations. That $14.5 million was funneled through and lost by the Receivership entities and would, therefore, be included in the Receiver's claims against NRP and Western. If NRP and Western pay FINRA Claimants $3.4 million to settle the FINRA arbitrations, NRP and Western likely will argue that the Receiver's damage claim (*i.e.*, the asset) must be reduced by $14.5 million to account for the losses already resolved.[6] Although the Receiver would vigorously oppose such arguments, there is no guarantee that Western and NRP will not make these arguments—and prevail. If NRP or Western were successful, the result could diminish the potential recovery of the remaining defrauded investors by at least $14.5 million.[7]

---

[6] The Receiver explained to the FINRA Claimants weeks ago that it would consider permitting the $3.4 million to be distributed so long as they obtained (1) NRP's and Western's written and financially-backed agreement that the Receiver's damage claim would not be limited by the FINRA Claimants' settlements; and (2) each implicated insurer's agreement that their policy limits would not be affected by the FINRA Claimants' settlements. (Lockner Decl., ¶ 14; Ex. 13 at 2-3.)

[7] And particularly unfairly so, as the FINRA Claimants, having filed their claims with the Receiver, would potentially receive their *pro rata* share, effectively being a double recovery.

Third, distributing the proceeds to the FINRA Claimants to the exclusion of all other similarly situated defrauded investors will erode the Receiver's ability to pursue a fair and equitable distribution. The FINRA Claimants would end up with a much higher *pro rata* share of any recovery compared to the rest of the defrauded investors, even though all were subjected to the same misconduct by Beckman, NRP, and Western.

### 2. The Remaining Settlement Terms Deplete Receivership Assets: Insurance Policies

The additional concessions the FINRA Claimants obtained from NRP, Western, and Beckman in the three settlement agreements also violate the Court's Receivership Orders. For example, the settlement agreements permit the FINRA Claimants to seek millions more from insurers, including Scottsdale Insurance Company and Everest Indemnity Insurance Company, who issued policies that benefit Beckman.

Because these insurance policies are held for the benefit of Beckman, they are Receivership assets and are frozen by the Court's Orders. *See Order Imposing Asset Freeze and Other Ancillary Relief*, No. 09-cv-3333 at 3; *Order Imposing Asset Freeze and Other Ancillary Relief And Setting Hearing on Motion for Preliminary Injunction*, No. 11-cv-0574, Docket No. 9, at 2-3 and 9. The Scottsdale Insurance Company's policy specifically identifies Bo Beckman as an insured. (Lockner Decl., ¶ 12; Ex. 11.) Similarly, the Everest Indemnity Insurance Company, under Policy No. FL5EE00006-091, defines the Assured as including registered representatives of the broker-dealer, *e.g.*, Beckman. (Lockner Decl., ¶ 13; Ex. 12, ¶ II(e).)

### B. The Court Should Enjoin Distribution Of The Settlement Proceeds Because They Were Secured By Investor Self Help

The Court's Receivership Orders prohibits investors, including the FINRA Claimants, from "continuing, settling, or enforcing any . . . settlement," "using self help" and "doing any act that may interfere with the taking . . . possession . . . of any assets of the Receiver Estates." *Order Appointing Receiver*, No. 11-cv-0574, Docket No. 10, at 6-7 (emphasis added); *see also Order Imposing Asset Freeze and Other Ancillary Relief*, No. 11-cv-0574, Docket No. 9, at 10; *Second Amended Order Appointing Receiver*, No. 09-cv-3333, Docket No. 68, at 2-4; *Order Continuing Appointment of the Temporary Receiver*, No. 09-cv-3332, Docket No. 96, at 7-9; *Order Imposing Asset Freeze and Other Ancillary Relief and Setting Hearing on Motion for Preliminary Injunction*, No. 09-cv-3333, at 8-9. As demonstrated above, the Settlement Proceeds impact a Receivership asset. Nevertheless, the FINRA Claimants continued and then settled the FINRA actions by using self help, thereby interfering with the Receiver's ability to take possession of an asset.

### III. CONCLUSION

For the foregoing reasons, the Court should enjoin: (1) the $3.4 million from being distributed to the FINRA Claimants (specifically, $500,000 from Western, $1.5 million from NRP, and $1.4 million from the U.S. Fire); and (2) enjoin the FINRA Claimants from pursuing money in an undetermined amount from Everest Indemnity Insurance Company and potential additional money from other Beckman, NRP, and/or Western insurers.

Dated: April 29, 2011

Respectfully submitted,

*s/Samuel T. Lockner*
R.J. Zayed (MN Bar No. 309,849)
Tara C. Norgard (MN Bar No. 307,683)
Brian W. Hayes (MN Bar No. 294,585)
Samuel T. Lockner (MN Bar No. 341,095)
Carlson, Caspers, Vandenburgh & Lindquist
225 S. 6th Street, Suite 3200
Minneapolis, MN 55402
Telephone: (612) 436-9600
Facsimile: (612) 436-9605
Email: slockner@ccvl.com
*Counsel for the Receiver*